## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | |
|---|---|
| **AVERAGE JOE'S ENTERTAINMENT GROUP, LLC,** | **Case No. 3:16-cv-03294** |
| **Plaintiff,** | |
| **v.** | **JUDGE MCCALLA** **MAGISTRATE JUDGE BROWN** |
| **SOUNDCLOUD LTD,** | **JURY DEMAND** |
| **Defendant.** | |
| **AND RELATED COUNTERCLAIMS.** | |

## REDACTED PUBLIC VERSION

## MEMORANDUM IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT BY DEFENDANT SOUNDCLOUD LTD.

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...........................................................................................1

FACTUAL BACKGROUND ............................................................................................3

    A.    SoundCloud ...........................................................................................3

        1.    The SoundCloud Platform .........................................................3

        2.    SoundCloud's Tools to Curb Infringements ................................4

        3.    SoundCloud's Processes and Policies to Curb Infringements ....................5

        4.    The Evolution of SoundCloud's Business .................................7

    B.    Average Joe's Business ........................................................................7

        1.    Album Production Process...........................................................7

        2.    Copyright Registration Practices ...............................................8

            a.    Late Registrations ......................................................8

            b.    Registrations of Sound Recordings Only as Albums or Parts of Albums..............................................................8

            c.    Registrations of Musical Compositions Only as Parts of Albums ...........................................................9

    C.    Interactions Between Average Joe's and SoundCloud ...........................9

    D.    Status of All Works at Issue as Parts of Sixteen Albums .....................11

    E.    Lack of Evidence of the Commencement Date of Alleged Infringements ......................................................................................11

SUMMARY OF ARGUMENT ........................................................................................12

ARGUMENT ...................................................................................................................13

    A.    Summary Judgment Standard ..............................................................13

    B.    SoundCloud Does Not Directly Infringe AJ's Copyrights. .................13

        1.    AJ and Other SoundCloud Users Directly Caused Any Allegedly Infringing Uploads, Downloads or Streams.............................15

2. SoundCloud's Design and General Operation of Its Service Did Not Constitute Volitional Acts That Proximately Caused Any Alleged Infringements. ...........................................................15

   a. Addition of a Paid Subscription Option with Premium Songs from Sources Other Than AJ ...............................16

   b. Addition of New Features to the SoundCloud Service. .................17

C. SoundCloud Does Not Engage in Contributory Infringement. ..............................19

   1. The Standard for Contributory Copyright Infringement ..........................19

   2. SoundCloud Does Not Engage in Contributory Infringement Under the *Grokster* Standard. ...................................21

      a. SoundCloud Is Capable of a Vast Number of Noninfringing Uses. ...................................................21

      b. SoundCloud Does Not Provide its Platform With the Object of Promoting Its Use to Infringe Copyrights by Clear Expression or Other Affirmative Steps to Foster Infringement. ...................................................22

      c. Under the Ninth Circuit's Formulation for Computer System Operators, SoundCloud Does Not Have Actual Knowledge of Specific Infringements of AJ's Works and Yet Fails to Take Simple Measures to Prevent Further Damage. ...................................................23

   3. SoundCloud Does Not Engage in Contributory Infringement Under the Pre-*Grokster* Standard. ...................................................25

D. SoundCloud Qualifies for Safe Harbor Under the DMCA. ...................................26

   1. Overview of the Section 512(c) Safe Harbor by Reason of Storage of Material at the Direction of Users and Related Activities ...................................................27

   2. SoundCloud Meets the Conditions for the Section 512(c) Safe Harbor. ...................................................28

      a. SoundCloud Provides Services Under Section 512(c) .................28

Case 3:16-cv-03294    Document 121    Filed 09/07/18    Page 3 of 56 PageID #: 2695

b.    SoundCloud Designated an Agent to Receive Notifications of Claimed Infringement and Expeditiously Responds to Notifications, but AJ Never Sent SoundCloud Any Notifications................................29

c.    SoundCloud Lacks Actual Knowledge of Specific Infringements of AJ's Music. ........................................29

d.    SoundCloud Has No Awareness of Red Flag Circumstances of Apparent Infringement of AJ's Works. .........................................................................31

e.    SoundCloud Derives No Direct Financial Benefit from Infringements of AJ's Works. ....................................31

f.    SoundCloud Lacks the Right and Ability to Control the Alleged Infringements. ...............................32

g.    SoundCloud Adopted, Informs Subscribers and Account Holders of, And Reasonably Implements Its Repeat Infringer Termination Policy. ...........................33

h.    SoundCloud Accommodates, and Does Not Interfere with, Any Statutory "Standard Technical Measures."..................33

E.    SoundCloud's Equitable Defenses Defeat AJ's Claims........................................34

    1.    Average Joe's Granted Licenses to SoundCloud and its Users. ...............34

    2.    Average Joe's Acquiesced to the Alleged Infringements. ........................35

    3.    Average Joe's Failed to Mitigate Its Alleged Damages...........................36

F.    The Copyright Act Strictly Limits AJ's Potential Statutory Damages. ................37

    1.    The Copyright Act Has Clear Rules on Statutory Damages....................37

    2.    For Statutory Damages Purposes, the Relevant "Works" Here Are AJ's Albums, Which Are Compilations That Include Both Individual Sound Recordings and Their Underlying Musical Compositions. ...........................................39

Case 3:16-cv-03294    Document 121    Filed 09/07/18    Page 4 of 56 PageID #: 2696

3.  There Is No Reason to Depart from the Copyright Act's Limitation on Parts of Compilations and Derivative Works In This Case ................................................................................................41

4.  Statutory Damages Are Available to AJ for No More Than Five Works That It Registered Within Three Months of Publication. ..........................................................................................42

CONCLUSION ................................................................................................44

# TABLE OF AUTHORITIES

**Page(s)**

C<small>ASES</small>

*Ushodaya Enterprises, Ltd. v. V.R.S. Int'l, Inc.*,
    64 F.Supp.2d 352, 353 (S.D.N.Y. 1999), *aff'd*, 2 F. App'x 128 (2d Cir. 2001)....................42

*Adobe Sys., Inc., v. Tanvir*,
    No. 16-cv-6844 (CRB), slip op. at n.3 (N.D. Cal. July 13, 2017) ..........................41

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)..............................................................................................13

*Bridgeport Music, Inc. v. Dimension Films*,
    410 F.3d 792 (6th Cir. 2005) ...............................................................................14

*Bridgeport Music, Inc. v. Rhyme Syndicate Music*,
    376 F.3d 615 (6th Cir. 2004) ....................................................................13, 21, 25

*Bridgeport Music, Inc. v. WM Music Corp.*,
    508 F.3d 394 (6th Cir. 2007) ...............................................................................21

*Bryant v. Media Right Prod'ns, Inc.*,
    603 F.3d 135 (2d Cir. 2010)............................................................................40, 42

*BWP Media USA, Inc. v. T&S Software Assocs., Inc.*,
    No. 3:13-CV-2961-BF, 2016 WL 1248908 (N.D. Tex. Mar. 25, 2016)................14

*Capitol Records, Inc. v. MP3tunes, LLC*,
    821 F.Supp.2d 627 (S.D.N.Y. 2011)................................................................26, 27

*Cartoon Network LP, LLLP v. CSC Holdings, Inc.*,
    536 F.3d 121 (2d Cir. 2008).............................................................................14, 17

*Chapman v. UAW Local 1005*,
    670 F.3d 677 (6th Cir. 2012) (en banc) ...............................................................13

*Clever Factory, Inc. v. Kingsbridge Int'l, Inc.*,
    No. 3:11-1187, 2013 WL 5375258 (M.D. Tenn. Sept. 24, 2013) .........................35

*Cobbler Nevada, LLC v. Gonzales*,
    No. 17-35041, 2018 WL 4055766 (9th Cir., Aug. 27 2018) ................................20

*Columbia Pictures Television v. Krypton Broad. Of Birmingham, Inc.*,
    106 F.3d 284 (9th Cir.1997) ................................................................................41

*CoStar Group, Inc. v. LoopNet, Inc.*,
    373 F.3d 544 (4th Cir. 2004) ............................................................................14

*CoStar v. LoopNet*,
    164 F.Supp.2d 688 (D. Md. 2001) ....................................................................27

*Data Gen. Corp. v. Grumman Sys. Support Corp.*,
    825 F.Supp. 361, 364 (D. Mass. 1993), *aff'd and remanded*, 36 F.3d 1147 (1st
    Cir. 1994) ...........................................................................................................42

*District Brewing Co., Inc. v. CBC Restaurant, LLC*,
    No. 2:15-CV-3114, 2016 WL 1366230 (S.D. Ohio Apr. 6, 2016) .......................35

*Dorchen/Martin Assocs., Inc. v. Brook of Cheboygan, Inc.*,
    No. 11–10561, 2013 WL 140790 (E.D. Mich. Jan. 11, 2013) ..............................37

*Effects Assocs., Inc. v. Cohen*,
    908 F.2d 555 (9th Cir. 1990) ............................................................................34

*Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*,
    936 F.2d 889 (6th Cir. 1991) ............................................................................35

*Energy Intelligence Group, Inc. v. Kayne Anderson Capital Advisors, LP*,
    No. H-14-1903, 2018 WL 2048896 (S.D. Tex. May 2, 2018) .............................36

*Feist Publ'n, Inc. v. Rural Tel. Serv. Co.*,
    499 U.S. 340 (1991) ..........................................................................................13

*Fogerty v. MGM Holdings Corp., Inc.*,
    379 F.3d 348 (6th Cir. 2004) ............................................................................13

*Frank Betz Assocs., Inc. v. J.O. Clark Const., L.L.C.*,
    No. 3:08-cv-00159, 2010 WL 2253541 (M.D. Tenn. May 30, 2010) ...................36

*Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*,
    443 F.2d 1159 (2d Cir. 1971)........................................................................21, 25

*Hydentra HLP Int. Limited v. Luchian*,
    Case No. 1:15-cv-22134-UU, 2016 WL 5951808 (S.D. Fla. June 2, 2016)............14

*Io Group, Inc., v. Veoh Networks, Inc.*,
    586 F.Supp.2d 1132 (N.D. Cal. 2008) ...........................................................27, 32

*Johnny's Fine Foods, Inc. v. Johnny's Inc.*,
  286 F.Supp.2d 876 (M.D. Tenn. 2003)............................................................35, 36

*Johnson v Jones*,
  149 F.3d 494 (6th Cir. 1998) ........................................................................34, 37

*King Records, Inc. v. Bennett*,
  438 F.Supp.2d 812 (M.D. Tenn 2006)...........................................................38, 40

*Lickerish, Inc. v. Alpha Media Grp.*,
  No. CV 13-00377 DMG (SSX), 2014 WL 12589641 (C.D. Cal. Jan. 2, 2014) ....................42

*Malibu Media, LLC v. Guastaferro*,
  No. 1:14-cv-1544, 2015 WL 4603065 (E.D. Va. July 28, 2015)......................36, 37

*Marobie-FL., Inc., v. National Association of Fire Equipment Distributors and
  Northwest Nexus, Inc.*,
  983 F.Supp. 1167 (S.D. Fl. 1997) .............................................................14

*Martinez v. Cracker Barrel Old Country Store, Inc.*,
  703 F.3d 911 (6th Cir. 2013) .....................................................................13

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
  545 U.S. 913 (2005)........................................................................... *passim*

*Murphy v. Lazarev*,
  589 Fed. Appx. 757 (6th Cir. 2014).............................................................34

*Nieves-Romero v. United States*,
  715 F.3d 375 (1st Cir. 2013)........................................................................13

*One Media IP Ltd. v. Henry Hadaway Organization*,
  Case No. 3:14-cv-00957, 2016 WL 3523885 (M.D. Tenn. June 28, 2016) ...........................40

*Parker v. Google, Inc.*,
  242 Fed.Appx. 833 (3d Cir. 2007) (per curiam) ...................................................14

*Perfect 10, Inc. v. Amazon.com, Inc.*,
  508 F.3d 1146 (9th Cir. 2007) ...................................................20, 23, 24, 25

*Perfect 10, Inc., v. CCBill LLC*,
  488 F.3d 1102 (9th Cir. 2007) .....................................................................31

*Perfect 10, Inc. v. Giganews, Inc.*,
    847 F.3d 657, 666 (9th Cir. 2017) ......................................................14

*Perfect 10, Inc., v. Giganews, Inc.*,
    Case No. CV 11-07098-AB, 2014 WL 8628031 (C.D. Cal. Nov. 14, 2014),
    *aff'd on other grounds*, 847 F.3d 657 (9th Cir. 2017) ...........................24

*Perfect 10, Inc. v. Giganews, Inc.*,
    No. CV–11–07098 AB, 2014 WL 8628034 (C.D. Cal. Nov. 14, 2014)........................ *passim*

*Princeton Univ. Press v. Mich. Document Servs.*,
    99 F.3d 1381 (6th Cir. 1996) ...........................................................17

*Roger Miller Music, Inc. v. Sony/ATV Pub., LLC*,
    No. 3:04-01132, 2005 WL 5351103 (M.D. Tenn. July 11, 2005), *aff'd in part
    and rev'd in part on other grounds*, 477 F.3d 383 (6th Cir. 2007).........................34

*Schenck v. Orosz*,
    No. 3:13–CV–0294, 2013 WL 5963557 (M.D. Tenn. Nov. 7, 2013)....................................26

*Smith v. Barnesandnoble.com*,
    LLC, 143 F.Supp.3d 115 (S.D.N.Y. 2015) .....................................................14, 26

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
    464 U.S. 417 (1984)...........................................................................21, 22, 25

*Tennessee Walking Horse Breeders & Exhibitors Ass'n v. National Walking
    Horse Ass'n*,
    528 F.Supp.2d 772 (M.D. Tenn. 2007)...............................................................40

*UMG Recordings, Inc. v. MP3.com, Inc.*,
    109 F.Supp.2d 223 (S.D.N.Y. 2000)...............................................................39, 40

*UMG Recordings, Inc. v. Shelter Capital Partners LLC*,
    718 F.3d 1006 (9th Cir. 2013) .........................................................27

*UMG Recordings, Inc. v. Veoh Networks, Inc.*,
    665 F.Supp.2d 1099 (C.D. Cal. 2009) ...............................................27

*Viacom Int'l, Inc. v. Fanzine Int'l, Inc.*,
    No. 98 CIV. 7448(KMW), 2000 WL 1854903 (S.D.N.Y. July 12, 2000) .............................34

*Viacom v. YouTube,*
 676 F.3d 19 (2nd Cir. 2012)......................................................................27

*Wolk v. Kodak Imaging Network, Inc.,*
 840 F.Supp.2d 724 (S.D.N.Y. 2012)........................................................27

*Xoom, Inc. v. Imageline, Inc.,*
 323 F.3d 279 (4th Cir. 2003) ........................................................38, 39, 42

**STATUTES**

17 U.S.C. § 101.................................................................................8, 9, 38, 39, 40

17 U.S.C. § 106...........................................................................................13

17 U.S.C. § 412.................................................................................37, 42, 43, 44

17 U.S.C. § 504(c) .....................................................................................40

17 U.S.C. § 504(c)(1).........................................................................38, 41, 44

17 U.S.C. § 512 (Digital Millennium Copyright Act ("DMCA"))........................*passim*

17 U.S.C. § 512(i)(1)(A).................................................................................28

17 U.S.C. § 512(i)(2).......................................................................................34

17 U.S.C. §§ 512 (a)-(d) ..............................................................................27

17 U.S.C. §§ 512 (a)-(d) (Online Copyright Infringement Liability Limitation Act
 ("OCILLA")).................................................................................12, 26, 27

17 U.S.C. § 512(c) ...................................................................................*passim*

17 U.S.C. § 512(c)(1)...............................................................................27, 28

17 U.S.C. § 512(c)(1)(B).................................................................................32

17 U.S.C. § 512(c)(2).......................................................................................28

17 U.S.C. § 512(c)(3)..............................................................................28, 29, 31

17 U.S.C. § 512(j)(1)(A).................................................................................27

Case 3:16-cv-03294 Document 121 Filed 09/07/18 Page 10 of 56 PageID #: 2702

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

17 U.S.C. § 512(k)(1)(B) .................................................................................................28

17 U.S.C. § 512(m) ........................................................................................................30

H.R.Rep. No. 94–1476, 2d Sess., *reprinted in* 1976 U.S.C.C.A.N. .............................38

H.R.Rep. No. 94-1476 (1976) .........................................................................................39

**RULES**

Fed. R. Civ. P. 56(a) .......................................................................................................13

**OTHER AUTHORITIES**

1 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 2.10 (2018)...........38

1 Nimmer on Copyright § 3.02 (2018) ...........................................................................38

2 Nimmer on Copyright § 7.16 (2017.............................................................................42

3 Nimmer on Copyright § 10.03. .....................................................................................34

Compendium III of Copyright Office Practices section 803.6 .......................................38

## PRELIMINARY STATEMENT

This is no ordinary copyright case against an online user-generated content service. SoundCloud is a major and highly respected platform that musicians created for musicians, allowing them and their supporters to store their music and make it available to the public. Average Joe's (occasionally "AJ") has had a beneficial relationship with SoundCloud for many years: Average Joe's and its artists placed their music on SoundCloud and used the service to collaborate with others, gain valuable exposure, and build fan loyalty. Average Joe's also authorized others to put its music on SoundCloud and to promote its music and its artists, and it had the ability to control its music that others contributed to the service.

SoundCloud provided Average Joe's with multiple powerful tools to manage its music on the service, to prevent infringements, and to remove content Average Joe's determined to be infringing. While Average Joe's complains about infringements on SoundCloud, Average Joe's admits it chose not to use any of the tools to halt the very infringements that it complains about in this suit. Why? Average Joe's conceded during discovery that it wants its music to have the exposure and momentum SoundCloud provides it. This case is a naked attempt by Average Joe's to leverage its intransigence into a windfall statutory damages award.

While Average Joe's description of its claims has been erratic, this dispute boils down to two basic issues. First, Average Joe's accuses SoundCloud of copyright infringement because a default setting on a feature that SoundCloud introduced in 2016 allows temporary offline listening of music when a subscriber is not connected to the service. But SoundCloud's account terms, which Average Joe's agreed to, authorize that feature and Average Joe's could disable that setting for all of the music it has uploaded. Disabling temporary offline listening for Average Joe's entire catalogue would take it less than a minute. Average Joe's has invested 21 months in

this litigation instead of a minute of effort to change a setting because it apparently (but wrongly) believes a massive windfall of statutory damages is available to it.

Second, Average Joe's argues that SoundCloud should redesign its system to block paying subscribers from having access to Average Joe's music while leaving that music available to all free users. Average Joe's pretext for the nonsensical suggestion is that the music should not be available to the paying subscribers unless Average Joe's gets a cut of the subscription revenue—even though Average Joe's did not contribute any "premium" music available only to subscribers. Average Joe's promotes this argument as leverage to get a commercial, revenue-generating deal from SoundCloud on better terms than the standard terms that Average Joe's rejected years ago.

In sum, SoundCloud has not violated Average Joe's copyrights, either directly or indirectly. Moreover, by its own conduct Average Joe's has forfeited any right to complain. Average Joe's has suffered no harm (to the contrary, it claims that removing its music from SoundCloud will harm it), and the safe harbor protections under the Copyright Act bar any relief against SoundCloud. Even if damages were an issue (they are not), Average Joe's inflated statutory damages calculations are directly contrary to clear statutory restrictions on the recoverable amount of statutory damages. The evidence on these points is clear and undisputed. For these reasons, SoundCloud is entitled to summary judgment in its favor on Average Joe's claims, on SoundCloud's equitable defenses, and on its protection under the safe harbor. In the alternative, SoundCloud is entitled to partial summary judgment regarding the statutory limitations on statutory damages available in the case.

# FACTUAL BACKGROUND

## A. SoundCloud

### 1. The SoundCloud Platform

Founded by musicians, SoundCloud has since 2008 operated an online music and audio platform that allows musicians to work collaboratively, gain exposure, and connect with fans. Statement of Undisputed Material Facts by Defendant SoundCloud Ltd. in Support of Its Motion for Summary Judgment ("SOUF") ¶¶ 1-2. The SoundCloud platform originally operated on a pure "user-generated content" model, meaning SoundCloud's *users,* and not SoundCloud itself, were responsible for posting all of the music and audio content available on the platform. *Id.* ¶ 5. From the start it allowed account holders to upload sound recordings of all kinds, to share them with others, and to make recordings available for public listening for free. *Id.* ¶¶ 2, 5-7.

To upload files, a user must sign up for an account and agree to SoundCloud's terms of use.[1] *Id.* ¶ 13. Those terms prohibit users from uploading material that infringes the copyrights of others. *Id.* ¶¶ 24-25. An uploader provides information, or "metadata," to accompany the file, including the artist, the title, the genre, and perhaps a standard industry identification number (the ISRC or International Standard Recording Code). *Id.* ¶ 31. The uploader can also determine whether a file is private or public and either accept SoundCloud's default permissions for and restrictions on use of the file or override them with other choices. SOUF ¶¶ 32-37. Account holders can set specific permissions and restrictions for their uploads on either a per-file or a "batch" basis. *Id.* ¶ 38.

When an account holder uploads a new audio file to the service, SoundCloud's

---

[1] Regular account holders have limited upload privileges and access to limited information. SoundCloud also offers a "SoundCloud Pro" option, which provides creators unlimited upload capability, and access to additional statistics and analytics about their tracks. SOUF ¶¶ 14, 17.

proprietary "Content ID" content management system compares the audio data of the file to information in several databases, looking for exact or near matches to reference files those databases maintain. *Id.* ¶ 49-55. If the system detects a match, it blocks the upload from becoming accessible on the SoundCloud platform unless a rightsholder working with SoundCloud has authorized, or "whitelisted," the uploader or the file. *Id.* ¶ 56.

### 2. SoundCloud's Tools to Curb Infringements

As a user-generated-content service with musicians' interests at heart, SoundCloud has always guarded against infringements on its system. From the beginning it designed technologies, processes, and policies for that purpose. *See* SOUF ¶¶ 19, 52, 73.

True to its mission as an artist-centered company, SoundCloud gives artists and other copyright holders significant control over their music. To begin with, SoundCloud provides *all* copyright holders, including Average Joe's, with tools to report claims of infringements directly to SoundCloud, including (1) a streamlined online infringement reporting webform on its website; (2) a "report" button on the web page for every track on the system; and (3) a dedicated e-mail address to which copyright holders can send written notifications of claimed infringement. *Id.* ¶¶ 69-72.

SoundCloud additionally provides account holders who upload their music additional tools for setting permissions and restrictions on use of their uploaded materials and for altering the default permissions and restrictions on the SoundCloud service, as SoundCloud described above. Those permission/restriction options include, among other things, the abilities of a user to make a permanent download or (since 2016) to listen temporarily offline to a file when the subscriber isn't connected to the service. *Id.* ¶¶ 32-37. Average Joe's has these tools as a music uploader. *See id.* ¶¶ 14, 32-37.

4

Music providers who have "non-commercial agreements" with SoundCloud, including Average Joe's, also have more powerful tools. They may send reference files for SoundCloud to integrate into its Content ID system, mentioned above, which will block uploads of matching files. They have access to SoundCloud's proprietary ███ system to manage that process, for example by whitelisting particular uploaders or particular files for upload as exceptions to the Content ID blocking process. The ███ system also allows a non-commercial partner such as Average Joe's to remove any material instantly from the service by using a "takedown tool": all one must do is ███████████████████████████████ ███████████████████████ SOUF ¶ 67.[2] Because Content ID like all detection tools is imperfect, SoundCloud relies on copyright holders to use the additional tools like the ███ removal feature, the online webforms, or the "report" buttons to remove infringements from the service. *Id.* ¶¶ 67-72.

### 3. SoundCloud's Processes and Policies to Curb Infringements

In addition to the technical tools described above, SoundCloud has established processes and policies to protect copyright holders. Apart from the instant removals through the ███ system, reports of infringement go to SoundCloud's dedicated copyright support team for action. That team responds to valid notifications by removing or disabling access to the accused material, typically within ████████████████████████ of receipt of a notification of claimed infringement that contains all the necessary information. *Id.* ¶ 75. Users whose uploads have been removed have an opportunity to file counter notifications to dispute the

---

[2] ███ provides other benefits as well: ███ users can also get ███████████████ which helps them target their promotional activities better. That information includes ███████████████████████ ███████ SOUF ¶ 15.

removals. *Id.* ¶ 78. The copyright support team manually reviews disputes and evaluates them carefully before reinstating any disputed material. *Id.* ¶ 79.

Apart from Content ID's blocking of uploads, SoundCloud's processes remove significant numbers of files at copyright owners' requests. In 2017, SoundCloud removed ████ files as a result of notifications of claimed infringement. *Id.* ¶ 81.

SoundCloud's terms of use prohibit use of its service to infringe the copyrights. *Id.* ¶ 25. Its website provides copyright education and stresses the importance of compliance with the law. SOUF ¶ 20. SoundCloud also adopted, announced, and reasonably implements a policy for terminating in appropriate circumstances subscribers or account holders who are repeat infringers. *Id.* ¶¶ 26, 82-87. It prominently informs its account holders of its policy. *Id.* Specifically, SoundCloud provides a graduated "three-strike" system for warning its users and terminating them if appropriate. *Id.* If a rightsholder claims infringement by a SoundCloud user, SoundCloud promptly removes the challenged material. *Id.* The user may dispute the claim within seven days. *Id.* If the user shows authorization to upload the recording, SoundCloud may restore the recording and the user will not receive a strike. *Id.* If the user does not dispute the removal successfully, SoundCloud issues a strike. *Id.* If a user receives a second strike, he loses the ability to authorize downloads of recordings he uploads. If a user receives three strikes,[3] SoundCloud terminates the user's account and prevents the user from registering a new account using the same credentials. *Id.* SoundCloud consistently carries out these policies. *See* SOUF ¶¶ 82-88. In 2017, SoundCloud terminated ████ account holders. *Id.* ¶ 89.

---

[3] Strikes stay on an account holder's record for twelve months, twice as long as standard industry practice. *See* Declaration of Joseph Hayes in Support of Defendant SoundCloud. Ltd.'s Motion for Summary Judgment ("Hayes Dec.") ¶ 33, n. 4.

6

### 4. The Evolution of SoundCloud's Business

In 2014, SoundCloud introduced an advertising program and announced its plans for a premium subscription option for its service. At that time it began to offer "commercial agreements" by which music companies could earn money from ███████████████████ ████████████████████████████████████ Under commercial agreements, music companies may deliver large catalogues of sound recordings to SoundCloud efficiently by commercial feeds. SOUF ¶¶ 94-95. In March 2016 SoundCloud introduced the premium subscription option. *Id.*¶ 96. That gives paying subscribers additional premium material that is not available to free users and additional features. *Id.* ¶¶ 98-103. One feature is the suppression of advertising; another is temporary offline listening, which allows a subscriber to keep listening to music when the subscriber isn't connected to the service for up to 30 days and so long as the subscriber continues to check in. *See id.* The subscriber cannot leave the service with a recording or make a permanent download unless the contributor has authorized it. *See id.* ¶¶ 34-35.

### B. Average Joe's Business

### 1. Album Production Process

AJ is a music recording and publishing company with an emphasis on the "country rap" genre. *See* SOUF ¶¶ 104-105. AJ's recording business creates, releases, and promotes albums of sound recordings on compact discs and online, and it uses social media like SoundCloud to promote its albums. *See id.* ¶¶ 104-105, 111-112, 117, 126. When AJ releases singles from an album, it uses the single as a tool to promote the album. *Id.* ¶ 112.

7

## 2. Copyright Registration Practices

### a. Late Registrations

Although the Copyright Act encourages prompt copyright registrations by barring statutory damages for infringements that begin before registration unless the copyright owner registers the copyright within three months of publication, AJ regularly delays applying for registration of its works until long after it releases, or publishes,[4] its albums. For example, it released the album "Ride Through the Country" on September 22, 2008, but registered the album on December 20, 2010, over two years later. SOUF ¶ 120 (citing Exhibit 28 to the Declaration of Andrew P. Bridges in Support of Defendant SoundCloud Ltd.'s Motion for Summary Judgment ("Bridges Dec.")). Other albums have registration dates many months after their publications. *Id.* (citing Bridges Dec. ¶¶ 15-17, Exs. 58-59). AJ registered only four of its albums within three months of publication. *Id.* ¶ 121-122.

### b. Registrations of Sound Recordings Only as Albums or Parts of Albums

AJ applied to register all the sound recordings in this case on an album-by-album basis. *Id.* ¶ 113. The title of the work in each sound recording copyright registration is the title of the album. *Id.* ¶ 114. It registers those albums as collective works containing multiple sound recordings, and in its applications it identifies individual sound recordings as the contents of the albums. *Id.* ¶ 115. AJ also generally identifies the albums as works made for hire in each

---

[4] "Publication" occurs when a copyright holder first distributes, or offers to distribute, copies or phonorecords of a copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending. 17 U.S.C. § 101 (definition of "publication"). A "phonorecord" is a material object on which sounds (other than those accompanying motion picture or other audiovisual work) are fixed. *Id.* (definition of "phonorecord").

registration, which indicates that the works are compilations or collective works.[5]  *See id.* ¶ 116.

AJ always deposits a compact disc of an album with its sound recording copyright applications.

SOUF ¶ 117.  In its applications, AJ lists as the publication date for each album the date of that

album's release.  *Id.* ¶ 118.

<blockquote>

**c.  Registrations of Musical Compositions Only as Parts of Albums**

</blockquote>

AJ also registered some musical compositions underlying the albums it produced,

identifying them as parts of the albums:  the registrations identify the musical composition and

provide an album name under the caption "Title of Larger Work."  All the musical compositions

at issue in this case underlie sound recordings that also are at issue.  SOUF ¶¶ 110, 119.

**C.  Interactions Between Average Joe's and SoundCloud**

Average Joe's signed up for a SoundCloud account at least as early as September 2011.

SOUF ¶ 127.  In October 2012, it sent an email to SoundCloud complaining about ███████

████████████  *Id.* ¶ 128.  In response, SoundCloud guided it on reporting alleged

infringements to SoundCloud, and instructed that it could report infringements using the

webform on the SoundCloud website or by sending an email to SoundCloud's copyright team.

*Id.* ¶ 130.

SoundCloud also invited AJ to participate in its Content ID system.  *Id.*  As a

consequence, in early 2014, AJ and SoundCloud entered into a "content delivery agreement

(non-commercial)" by which SoundCloud would "ingest," or receive and process, audio files

---

[5] The definition of a "work made for hire" in the Copyright Act specifies that work-made-for-hire agreements (on which Average Joe's relies) are valid for only specific types of works; the list includes compilations and contributions to collective works but not sound recordings or musical compositions that fall outside those categories.  *See* 17 U.S.C. § 101 (definition of "work made for hire, subparagraph (2)).

from AJ into the Content ID reference database.  *Id.* ¶¶ 136-139.  AJ then delivered files to

SoundCloud for "fingerprinting" (the creation of code that represents the perceptual

characteristics of a recording) and inclusion in the Content ID database.   *Id.*  AJ also obtained

access to SoundCloud's █████ tool for its "averagejoesent" account.  SOUF ¶ 140.  With █████

AJ had the ability to whitelist accounts, to control access to the files it uploaded, and to remove

infringements immediately.  *Id.* ¶¶ 63-67, 140.  Using the same process available to any

SoundCloud account holder, AJ uploaded audio recording files to its "averagejoesent" profile on

SoundCloud, including recordings of works it asserts in this case.  *Id.* ¶¶ 140-142, 144-145.  It

also whitelisted accounts that uploaded audio files of works AJ alleges infringe in this case.  *Id.*

   Beginning in November 2014, SoundCloud and AJ discussed a new "commercial

agreement" to allow AJ to earn revenue from files it uploaded to SoundCloud.  SOUF ¶¶ 150-

152.  AJ and SoundCloud exchanged drafts of a written agreement sporadically for months, but

the parties never closed a substantial gap in their negotiating positions.  *Id.*  AJ demanded

unacceptable terms, ███████████████████████  *Id.*  SoundCloud launched its subscription option

in the United States on March 29, 2016.  *Id.* ¶ 96.  The parties' discussions continued after the

launch but in May 2016 their exchange of emails died out as AJ began to prepare for this

litigation, *see id.* ¶¶ 150-152, which it launched in December 2016 without reporting or

otherwise notifying SoundCloud about alleged infringements.  *Id.* ¶¶ 153, 155, 157-158.

   AJ never used SoundCloud's ██████ tool, to which it had access as a non-commercial

partner, to remove any material from SoundCloud.  SOUF ¶ 157.  AJ apparently never used its

upload maintenance or permission controls to disable features of its uploads that it now

complains about.  *Id.* ¶¶ 147-148.  AJ never used any of the other online tools, such as the

infringement claim webform or the "report" buttons on SoundCloud's sound recording pages, to

10

report claims of infringement.  *See id.* ¶¶ 147-148, 153, 155, 157-158.  AJ never sent any

notifications of claimed infringement to SoundCloud by mail or email.  *Id.*  AJ never complained

in any way to SoundCloud, even informally, about its material on SoundCloud between 2012 and

the filing of this lawsuit.  *See id.* ¶ 132 (citing Hayes Dec. ¶ 26).

### D.  Status of All Works at Issue as Parts of Sixteen Albums

While AJ initially asserted 194 individual sound recordings and musical compositions as

separate works, it later reduced the number of works it asserts in the case, conceding that

registrations after March 29, 2016, were untimely for statutory damages and abandoning claims

for works registered after that date.  *See* SOUF ¶¶ 107-108.  The remaining works in the case

consist of 78 individual sound recordings and 22 musical compositions.  *Id.*  All of the claimed

individual sound recordings, however, are parts of 16 total albums, and all of the claimed

musical compositions underlie the same 16 albums.  *Id.*¶ 109-110.

### E.  Lack of Evidence of the Commencement Date of Alleged Infringements

Plaintiff cannot establish when any alleged infringements of its works on the SoundCloud

platform began.  AJ has contended during the litigation that alleged infringements began on

March 29, 2016, with the introduction of the paid subscription option.  Bridges Dec. Ex. 62.  But

AJ's Nathan Thompson had sent an email to SoundCloud over five years earlier, on October 1,

2012, alleging ████████████████████ already on the platform.  SOUF ¶ 128.  Any

alleged infringement of AJ's works on the SoundCloud platform could have begun on the day AJ

released each album, long before AJ complained to SoundCloud or even noticed any

infringements: a corporate witness for Girlilla Marketing, AJ's social media marketing firm from

2008 to 2012, testified that infringements of AJ's works occur "everyday" "on every single

platform" across the Internet, and that this was true throughout the time Girlilla worked with AJ.

*Id.* ¶ 126. In light of this, AJ cannot provide, and it has not provided, evidence to establish when infringements began. This is an important gap in AJ's case for statutory damages, as SoundCloud will discuss below.

## SUMMARY OF ARGUMENT

Average Joe's, seeking $15 million as its calculation of maximum statutory damages, has no facts to support its legal theories. (1) SoundCloud has not itself engaged in any volitional conduct causing direct infringements of Average Joe's works. Thus there is no direct copyright infringement by SoundCloud. (2) The SoundCloud service and platform are capable of substantial noninfringing and beneficial uses, and SoundCloud has not intentionally induced infringements by others through clear expression or other affirmative steps. Therefore there is no contributory infringement. (3) The "safe harbor" under the Online Copyright Infringement Liability Limitation Act (OCILLA), part of the Digital Millennium Copyright Act (DMCA), moots the claims against SoundCloud as an online service provider operating a user-generated content storage service that meets all the conditions of the safe harbor. (4) AJ acquiesced in any infringements of its works on the SoundCloud service and failed to take any steps to mitigate its alleged damages by its refusal to use any of the many tools and processes for removing or notifying SoundCloud about alleged infringements; AJ affirmatively made those choices precisely because it did not want its music to come off the SoundCloud service. (5) Even if liability were to exist, the Copyright Act statutory damages provision explicitly limits the number of "works" that count for statutory damages to number of the albums associated with copyright registrations that AJ obtained either within three months of publication or before infringements began. As a consequence, for statutory damages purposes, only five "works" are at issue, not the 100 works that AJ claims.

12

SoundCloud is entitled to summary judgment on all these grounds.

## ARGUMENT

### A.  Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "When the non-moving party fails to make a sufficient showing of an essential element of his case on which he bears the burden of proof, the moving parties are entitled to judgment as a matter of law and summary judgment is proper." *Martinez v. Cracker Barrel Old Country Store, Inc.*, 703 F.3d 911, 914 (6th Cir. 2013) (quoting *Chapman v. UAW Local 1005*, 670 F.3d 677, 680 (6th Cir. 2012) (en banc)). "If the non-moving party's evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249-50 (1986)(citations omitted). "Conclusory allegations, empty rhetoric, unsupported speculation, or evidence which, in the aggregate, is less than significantly probative will not suffice to ward off a properly supported summary judgment motion." *Nieves-Romero v. United States*, 715 F.3d 375, 378 (1st Cir. 2013) (quotations and editing omitted).

### B.  SoundCloud Does Not Directly Infringe AJ's Copyrights.

A plaintiff alleging copyright infringement plaintiff must prove that (1) it owns or is the exclusive licensee of a valid copyright and (2) the alleged infringer violated at least one exclusive copyright right under 17 U.S.C. § 106. *Fogerty v. MGM Holdings Corp., Inc.,* 379 F.3d 348, 352 (6th Cir. 2004) (citing *Feist Publ'n, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991)); *Bridgeport Music, Inc. v. Rhyme Syndicate Music*, 376 F.3d 615, 621 (6th Cir. 2004).

13

Courts widely recognize that direct infringement requires "volitional conduct" by the alleged infringer. Consistently with the national trend,[6] the Sixth Circuit has recognized that direct infringement occurs where *a defendant* intentionally and knowingly copies a copyrighted work. *Bridgeport Music, Inc. v. Dimension Films*, 410 F.3d 792, 802 (6th Cir. 2005). The volition requirement applies regardless of which exclusive right a plaintiff claims the defendant infringed. *See Smith v. Barnesandnoble.com*, LLC, 143 F.Supp.3d 115 (S.D.N.Y. 2015) (assembling decisions). The Ninth Circuit recently analyzed the volitional conduct element at length, ratifying the view that it is a basic requirement of causation: "As its name suggests, *direct* liability must be premised on conduct that can reasonably be described as the *direct cause* of the infringement." *Perfect 10, Inc. v. Giganews, Inc.,* 847 F.3d 657, 666 (9th Cir. 2017) (quoting district court's decision in *Perfect 10, Inc. v. Giganews, Inc.,* No. CV–11–07098 AB (SHx), 2014 WL 8628034 at *7 (C.D. Cal. Nov. 14, 2014)). AJ can point to no evidence demonstrating that SoundCloud engaged in a volitional act of direct infringement, and its claims therefore fail.

---

[6] *See CoStar Group, Inc. v. LoopNet, Inc.*, 373 F.3d 544, 551 (4th Cir. 2004) (online real estate listing service not direct infringer where users upload photographs); *Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d 121, 130-33 (2d Cir. 2008) (cable provider not direct infringer for providing video recording service for users); *Parker v. Google, Inc.*, 242 Fed.Appx. 833, 837 (3d Cir. 2007) (per curiam) (Google's archiving of posts by others not direct infringement); *Hydentra HLP Int. Limited v. Luchian*, Case No. 1:15-cv-22134-UU, 2016 WL 5951808, *8 (S.D. Fla. June 2, 2016) (no volitional conduct by operator of online viewing service where others uploaded infringing videos); *Marobie-FL., Inc., v. National Association of Fire Equipment Distributors and Northwest Nexus, Inc.*, 983 F.Supp. 1167, 1178 (S.D. Fl. 1997) (provision of means to reproduce not direct infringement where users initiated infringing actions); *BWP Media USA, Inc. v. T&S Software Assocs., Inc.*, No. 3:13-CV-2961-BF, 2016 WL 1248908 at *442 (N.D. Tex. Mar. 25, 2016) (no direct infringement where users of defendant's website posted images).

14

### 1. AJ and Other SoundCloud Users Directly Caused Any Allegedly Infringing Uploads, Downloads or Streams.

Because SoundCloud itself does not upload files to its platform, AJ can point to no evidence that SoundCloud posted infringing audio files to the platform. Indeed, AJ itself admits that it uploaded files it now claims infringe the works it asserts in this case. *See* SOUF ¶¶ 140-142, 144. It also admits that it whitelisted or otherwise authorized others, including its digital marketing vendor Girlilla, to upload files it now claims to be infringements. *Id.* It further admits that other SoundCloud users uploaded allegedly infringing files. *Id.* ¶ 143. AJ's admissions are consistent with its pleadings: *AJ has not alleged that SoundCloud itself committed the infringements*. *See* Complaint (Doc. 1) ¶¶ 28, 32; *id.* at 11 (¶¶ 1, 2, 3, 4 of prayer for relief)(all using the passive voice). On the other hand, AJ explicitly says repeatedly that it is SoundCloud's *users* who are allegedly engaging in infringements. *See id.* ¶¶ 8, 9, 36, 40.

SoundCloud does not concede that its users have engaged in infringing conduct, but only that SoundCloud users (not SoundCloud) activated the uploads, downloads, streams, or temporary offline listening of audio files that AJ now alleges to have been the infringing conduct. SOUF ¶ 143.

### 2. SoundCloud's Design and General Operation of Its Service Did Not Constitute Volitional Acts That Proximately Caused Any Alleged Infringements.

AJ suggests two reasons that SoundCloud should be liable for direct infringement of AJ's copyrights. First, AJ argues that SoundCloud's addition of paid subscriptions to its existing platform caused SoundCloud to "monetize" AJ's music. It argues that SoundCloud's *paid* subscribers should lose access to AJ's music that is available to *free* users. Second, AJ argues that SoundCloud's addition of new features to its service, including a temporary "offline listening" feature, infringed AJ's copyrights because SoundCloud users could temporarily

engage in offline listening when Internet connections were unavailable. AJ condemns SoundCloud for failing to disable that feature by default for sound recordings that were on the platform when the feature was added, even though SoundCloud's terms of use authorized that feature and AJ had control over its recordings and could have disabled that feature for all of them in less than a minute per account it controlled. SOUF ¶¶ 31-41, 147-148. Both of AJ's arguments fail as a matter of law for lack of an intentional, volitional act by SoundCloud that proximately caused any infringements of AJ's works.

### a. Addition of a Paid Subscription Option with Premium Songs from Sources Other Than AJ.

When SoundCloud added a paid subscription option to its service, its commercial partners contributed new, "premium" content exclusively for the paying subscribers. SOUF ¶ 92. The music that had always been free on SoundCloud remained free; new and special offerings by commercial partners commanded a premium. *Id.* ¶ 97-100. Because AJ had made its songs available for free on SoundCloud, they were available to everyone and no paying subscriber paid anything to access AJ's music. *Id.* AJ appears to argue, however, that it is an infringement for SoundCloud not to pay AJ royalties because some paying subscribers may access AJ's free content even though they don't need to pay for it. AJ's position not only defies logic but is also incorrect as a matter of law.

The Ninth Circuit examined and rejected a similar argument that charging fees to access a service amounted to "sale" of particular material available through the service, ruling that the provision of access did not constitute volitional conduct with respect to any specific material. *Giganews,* 847 F.3d at 669. The court of appeals adopted the district court's conclusion that "the undisputed evidence affirmatively shows Livewire sells access to all the content available on Giganews' servers. There is no evidence that Livewire *sells* any of Perfect 10's copyrighted

material." *Id.* at 669 (emphasis in original). Here, as in *Giganews*, SoundCloud's paying subscribers receive access to all recordings on the SoundCloud platform. This case is an even stronger case for SoundCloud, however, because the defendants in *Giganews* had a service that did not distinguish between ordinary and premium content. Here SoundCloud has that distinction. AJ's recordings are *not* the premium recordings for which paying subscribers part with their money. Put simply, no subscriber is paying for access to AJ's works. SOUF ¶ 100.

The *Giganews* court also determined that Giganews did not directly infringe Perfect 10's copyrights because the plaintiff lacked evidence that "Giganews exercised control (other than by general operation of a Usenet service); selected any material for upload, download, transmission or storage; or instigated any copying, storage, or distribution." *Id.* at 670. Here, SoundCloud similarly did not instigate any allegedly infringing activity. SoundCloud is unlike the defendant copy shop in *Princeton Univ. Press v. Mich. Document Servs.*, 99 F.3d 1381, 1383 (6th Cir. 1996), which itself initiated and made the infringing copies and then sold the copies. SoundCloud is instead like the defendant Cablevision in *Cartoon Network* which merely sold "access to a system that automatically produces copies on command"; it is a Cablevision user, who selects and commands, or presses the button for the materials to be recorded using Cablevision's system, whose volitional conduct was relevant to direct infringement. *See Cartoon Network,* 536 F.3d at 131-32. Because here it is SoundCloud's users, including AJ itself, who take the initiative, by commanding the system, to upload, download, stream, or listen temporarily to materials offline using SoundCloud's system, SoundCloud itself lacks the requisite volition for any act of direct infringement.

### b. Addition of New Features to the SoundCloud Service.

AJ cannot dispute that it has direct and immediate control over whether its own songs are available for temporary offline listening on the SoundCloud service. Nevertheless, AJ accuses

SoundCloud of infringement because it added temporary offline listening as a feature of its subscription option. The feature permits subscribers to have access to recordings temporarily[7] while they are offline as though they were listening to the recordings online. SOUF ¶¶ 102-103. The addition of this feature for subscribers across the entire SoundCloud platform, which a rightsholder can disable for its recordings on a track-by-track basis or whole-catalogue basis at any time, does not constitute a volitional act of infringement by SoundCloud of AJ's recordings. *Id.*¶¶ 36-38, 102-103.

AJ argues that SoundCloud's addition of this feature must be an infringement because SoundCloud did not adequately inform AJ about it. That argument fails for two reasons. First, SoundCloud's terms of use identified a wide variety of uses that its uploaders enabled and authorized when they uploaded recordings to the platform, and it made crystal clear that SoundCloud could change the features of the service. Like every account holder, Average Joe's had to consent to those provisions. The 2011 terms of use said, among other things, "SoundCloud may change the features of any type of account . . . at any time and for any reason." *Id.*¶ 28. The terms also said:

> By uploading Your Content to the Platform, you also grant a limited, worldwide, non-exclusive, royalty-free, fully paid up, licence to other users of the Platform… to use, copy, transmit, or otherwise distribute, publicly display, publicly perform, prepare derivative works of, make available and otherwise communicate to the public Your Content within the parameters set by you using the Services. You can limit and restrict the availability of certain of Your Content to other users of the Platform… at any time using the settings on the sound page for each sound you upload, subject to the provisions of the Disclaimer section below."

*Id.*¶ 28. The terms of use effective March 29, 2016, when the subscription option with

---

[7] The "offline sync" allows users to listen to recordings offline for short periods of time until they reconnect to the SoundCloud service online. It does not allow permanent downloads, and users cannot retain recordings if they quit the service. *See* SOUF ¶ 102-13.

temporary offline listening began, stated:

> By uploading Your Content to the Platform, you also grant a limited, worldwide, non-exclusive, royalty-free, fully paid up, license to other users of the Platform…to use, copy, *listen to offline*, repost, transmit, or otherwise distribute, publicly display, publicly perform, adapt, prepare derivative works of, compile, make available and otherwise communicate to the public, Your Content utilizing the features of the Platform from time to time, and within the parameters set by you using the service.  You can limit and restrict the availability of certain of Your Content to other users of the Platform… at any time *using the permissions tab in the track edit section for each sound you upload*, subject to the provisions of the Disclaimer section below.

SOUF ¶ 30 (emphasis added).

Second, AJ's failure to learn about and use tools that SoundCloud provided to both uploaders and to copyright owners was not SoundCloud's fault for which SoundCloud bears liability.  The evidence is clear that (a) SoundCloud gives uploaders control over various uses of recordings on the platform, (b) AJ had control over the temporary offline listening availability of its uploads when that feature started, and (c) AJ never used its account controls to disable temporary offline listening.  *Id.* ¶¶ 36-38, 102-103, 147-148.  That is consistent with AJ's pattern of avoiding any effort to control its own recordings on the SoundCloud platform whether via tools such as SoundCloud's ▮▮▮ content management system or using SoundCloud's webforms for notifying the company of claims of copyright infringement.  *Id.* ¶ 69.

### C.     SoundCloud Does Not Engage in Contributory Infringement.

#### 1.     The Standard for Contributory Copyright Infringement

In *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd*., the Supreme Court reformulated the standard for imposing liability for contributory copyright infringement, stating succinctly that "one infringes contributorily by intentionally inducing or encouraging direct infringement."  *Id.*, 545 U.S. 913, 930 (2005).  Within that general standard, the Court identified two categories of liability, which Justice Ginsburg summarized as follows: "Liability under our jurisprudence may

19

be predicated on actively encouraging (or inducing) infringement through specific acts (as the Court's opinion develops) or distributing a product distributees use to infringe copyrights if the product is not capable of 'substantial' or 'commercially significant' noninfringing uses." *Grokster*, 545 U.S. at 936-37, 942 (Ginsburg, J., concurring). Thus, under *Grokster*, a plaintiff must show that the defendant (1) provides a product or service incapable of substantial non-infringing uses or (2) intentionally induces infringement by clear expression or other affirmative steps to foster infringement.

Courts of appeals have recognized *Grokster*'s controlling force in determining liability for contributory infringement claims. For example, the Ninth Circuit applied *Grokster* in holding that a computer system operator could be held contributorily liable if a plaintiff proved that (1) a defendant substantially assisted infringements; (2) the defendant had *actual* knowledge of *specific* infringements on its system; *and* (3) with that knowledge, the defendant failed to take simple measures to prevent further damage to the plaintiff's copyrighted works. *Perfect 10, Inc. v. Amazon.com, Inc.,* 508 F.3d 1146, 1169 (9th Cir. 2007).

Just two weeks ago the Ninth Circuit reaffirmed its adherence to the *Grokster* standard, recognizing that contributory infringement requires wrongful intent with "purposeful, culpable expression and conduct." *Cobbler Nevada, LLC v. Gonzales,* No. 17-35041, 2018 WL 4055766, at *4 (9th Cir., Aug. 27 2018) (quoting *Grokster,* 545 U.S. at 937). A mere failure to act, such as a failure to police an Internet service or a failure to take affirmative steps to prevent infringement, does not suffice for contributory infringement. *Id.* at *4 (quoting *Grokster,* 545 U.S. at 939 n.12). Nor does mere knowledge of *actual infringing uses* of a service suffice. *Id.* (quoting *Grokster,* 545 U.S. at 937).

Some courts have not yet grappled with the *Grokster* standard. The Sixth Circuit, in *Bridgeport Music, Inc. v. WM Music Corp.*, 508 F.3d 394, 401 (6th Cir. 2007), discussed contributory infringement without mentioning *Grokster*, instead relying on pre-*Grokster* Sixth Circuit precedent and other earlier decisions. Applying that old formulation, the court held that contributory infringement occurs when one, "with knowledge of the infringing activity, induces, causes, or materially contributes to the infringing conduct of another." *WM Music,* 508 F.3d at 400 (citing *Rhyme Syndicate,* 376 F.3d at 621, and *Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971)). Under that outdated standard, as now, constructive knowledge did not suffice for liability. *Sony Corp. of Am. v. Universal City Studios, Inc.,* 464 U.S. 417, 439-42 (1984).

Although SoundCloud believes *Grokster* controls, because the Sixth Circuit has not yet invoked *Grokster* SoundCloud addresses both the *Grokster* standard (and the Ninth Circuit's formulation) and the Sixth Circuit's *WM Music* standard. AJ's claims fail under both standards.

> **2.  SoundCloud Does Not Engage in Contributory Infringement Under the *Grokster* Standard.**
>
> > **a.  SoundCloud Is Capable of a Vast Number of Noninfringing Uses.**

Contributory infringement requires wrongful, or culpable, conduct that fosters infringement. Courts do not impute wrongful conduct from mere knowledge that a service may be used to infringe so long as the service is capable of substantial noninfringing uses. *See Grokster*, 545 U.S. at 933 (no imputation of wrongful intent); *Sony*, 464 U.S. at 439-42 (no liability based on knowledge that customers may use product for infringements).

AJ admits that the SoundCloud platform has many noninfringing uses. SOUF ¶ 8. Undisputed evidence confirms this: SoundCloud enables tens of thousands of creators, including individual artists, independent labels and major record labels, to upload and share their

21

recordings on the platform every day. *Id.*¶¶ 5-9. Creators use the service for many purposes and measure the success using a number of metrics including number of plays, likes, comments, reposts, and downloads to discover which recordings perform best and who likes them most. *Id.* AJ itself used the SoundCloud service to upload and share its own works for years. *Id.*¶¶ 140-142, 145.

> **b.** **SoundCloud Does Not Provide its Platform With the Object of Promoting Its Use to Infringe Copyrights by Clear Expression or Other Affirmative Steps to Foster Infringement.**

Under *Grokster*, contributory infringement occurs where a defendant provides a service or product "with the object of promoting its use to infringe copyright, as shown by clear expression or other affirmative steps taken to foster infringement" by its customers. *Grokster*, 545 U.S. at 936-37. "[M]ere knowledge of infringing potential *or of actual infringing uses*" however, is insufficient. *Id.* at 937 (emphasis added).

SoundCloud did not promote, advertise or encourage infringements of AJ's copyrights. Indeed, undisputed evidence demonstrates that SoundCloud undertakes significant efforts to *discourage*, *prevent*, and *remove* infringements on its platform. SoundCloud's terms of use explicitly prohibit copyright infringement. SOUF ¶ 25. It provides comprehensive information about copyright law on its website to educate users and visitors about the importance of respecting others' copyrights. *Id.* ¶ 20. SoundCloud also uses its proprietary Content ID content management system to block unauthorized uploads. *Id.* ¶¶ 49-62. To supplement that system, SoundCloud provides multiple paths for copyright holders to report claims of infringement; they include convenient web forms, a dedicated email address, and a removal tool in its ▆▆▆▆" content management system that immediately removes material from the service. *Id.*¶¶ 67-72. SoundCloud's copyright support team promptly processes notifications of claimed infringement that rightsholders submit through web forms and by email, responding ▆▆▆▆▆▆▆▆

22

██████████████████████ SOUF ¶ 75.  SoundCloud vigorously applies its repeat infringer termination policy, warning users about "strikes" and terminating significant numbers of users because of claims of infringement.  *Id.* ¶¶ 82-90.  Nothing SoundCloud does suggests that it fosters, or is even complacent about, copyright infringement on its platform.  In fact, the evidence establishes the vigilance with which SoundCloud addresses claims of infringement.

       **c.**    **Under the Ninth Circuit's Formulation for Computer System Operators, SoundCloud Does Not Have Actual Knowledge of Specific Infringements of AJ's Works and Yet Fails to Take Simple Measures to Prevent Further Damage.**

Under the Ninth Circuit's post-*Grokster* formulation specifically for online services, "a computer system operator can be held contributorily liable if it 'has *actual* knowledge that *specific* infringing material is available using its system and can 'take simple measures to prevent further damage' to copyrighted works yet continues to provide access to infringing works…."  *Amazon.com,* 508 F.3d at 1172 (citations omitted; emphasis in original).

AJ argues that its provision of reference files for SoundCloud to include in its Content ID system conferred knowledge on SoundCloud of actual infringements.  That argument fails for three reasons.  First, to the extent that Content ID identified matching files, SoundCloud's system *blocked* uploads of those files unless AJ had whitelisted either the uploaders or the files.  SOUF ¶¶ 55-59, 137-140.  Any uploads on the platform that AJ did not whitelist were not detected by Content ID (typically because the files were of different recordings or had been altered beyond Content ID's ability to detect them).  *Id*.  That is why SoundCloud provided additional tools for copyright owners to remove recordings on the platform.  *Id*. ¶¶ 68-80.

Second, although as a practical matter Content ID kept identical files off the service, the fact that a file matches a reference file in Content ID does not mean that the sound recording is necessarily an infringement.  In addition to the reasons SoundCloud discussed above at page 4,

the matches could be "false positives" (as when the system blocks a radio interview discussing music) and uploads could be fair use. SOUF ¶ 60; *see also* Hayes Dec. ¶ 10.

Third, AJ's deliberate failure to use the many tools at its disposal to report claims of infringement left SoundCloud in no position to know whether persons engaging with AJ's uploads were infringers. AJ admits it never reported claims of infringement to SoundCloud despite having multiple ways to do so. *Id.* ¶¶ 147-148, 153, 157-158. AJ sent claims to other platforms, asking them to remove material, but it did not do so with SoundCloud. *Id.* ¶ 159.

The facts of this case resemble those of *Perfect 10, Inc., v. Giganews, Inc.,* Case No. CV 11-07098-AB (SHx), 2014 WL 8628031 (C.D. Cal. Nov. 14, 2014), *aff'd on other grounds*, 847 F.3d 657 (9th Cir. 2017). In that case the plaintiff refused to provide notifications of claimed infringement—which it could easily have done—but demanded that the online service provider purge the plaintiff's materials based on indirect information. The district court granted summary judgment to defendants for lack of actual knowledge of specific alleged infringements. *See Giganews,* 2014 WL 8628031 at *7-*10. This Court should do so here.

AJ also cannot show that SoundCloud can take, but fails to take, simple measures to prevent further damage to copyrighted works." *Amazon.com*, 508 F.3d at 1172. Indeed, SoundCloud takes all available "simple measures." SoundCloud's Content ID system prevents unauthorized uploads of files matching to those in its reference database, although its systems cannot identify files that differ significantly from reference files.[8] Because of that limitation, and

---

[8] While SoundCloud's system can identify that contain some variation from the reference files in Content ID, it cannot identify significantly altered files. Alteration or "obfuscation" as SoundCloud refers to it internally, can occur when an uploader has deliberately changed the tempo or pitch of a file. A protected work may also be unidentifiable by Content ID if the upload in question is a recording made by a cellular phone at a live performance. SOUF ¶ 58; *see also* Hayes Dec. Ex. 1.

to address uploads that occur before a copyright holder provides reference files for Content ID, SoundCloud also gives rightsholders several other tools for removing files from the platform and for managing permissions and restrictions on use of their files. SOUF ¶¶ 67-80. Its processes and policies also effectively respond to reports and claims of infringement. The *only* available and unused simple measure here is *AJ's* use of any of the tools to manage the materials it uploaded and to remove other infringements it identifies from the platform. Instead, AJ sits back and does nothing. *Id.*¶¶ 147-149, 153, 155, 157-159.

AJ does nothing because wants its music on SoundCloud and therefore does not want to use SoundCloud's tools and processes to remove any of its music. *Id.* ¶ 155. But it wants SoundCloud to redesign its service so that AJ's music would be available only to free subscribers, not to paying subscribers. Such a design, providing paying subscribers less than free users, is nonsensical; in any event, that redesign is not a "simple measure" that SoundCloud can easily engineer. SOUF ¶ 39. For all these reasons, SoundCloud does not fail to take any simple measures to prevent harm to AJ's works.

### 3. SoundCloud Does Not Engage in Contributory Infringement Under the Pre-*Grokster* Standard.

Under the pre-Grokster standard, "one who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another, may be held liable as a 'contributory' infringer." *Rhyme Syndicate*, 376 F.3d at 621 (*citing Gershwin Publ'g Corp.*, 443 F.2d at 1162). SoundCloud has no actual knowledge of specific infringing activity, as it discussed at 23-24 above; the Supreme Court in *Sony*, before *Grokster*, ruled out constructive knowledge as a basis of contributory infringement liability. *See Sony,* 464 U.S. at 439-42. Both the interpretive principles "noscitur a sociis" (a word is known by its companions) and "eiusdem generis" (of the same kind) suggest that, in the context of the pre-*Grokster* formulation

("induces, causes, or materially contributes"), a "material contribution" to infringement must resemble "inducing" or "causing." No action by SoundCloud rises to that level for reasons SoundCloud explained above at pages 3-4 and 10. Moreover, SoundCloud's provision of its platform cannot be a material contribution to infringements of AJ's works because it is capable of substantial noninfringing uses. *See Smith,* 143 F.Supp.3d at 126-27. SoundCloud's service, its actions, and its practices are thus not culpable behavior.

AJ has manufactured this dispute—evidently in pursuit of windfall statutory damages— by deliberately failing to cooperate with SoundCloud, by refusing to use the tools SoundCloud provided uploaders and copyright holders to manage their material, and by insisting it wants its material to stay on the SoundCloud service but demanding SoundCloud alter the design of its service. *See* SOUF ¶¶ 31-41, 147-149, 153, 155, 157-159. On the undisputed facts, AJ cannot show any wrongful conduct by SoundCloud under any version of the contributory infringement standard, and the Court should grant summary judgment to SoundCloud on AJ's claims of contributory copyright infringement.

### D. SoundCloud Qualifies for Safe Harbor Under the DMCA.

The safe harbor of the Online Copyright Infringement Liability Limitation Act ("OCILLA") (Title II of the Digital Millennium Copyright Act), 17 U.S.C. § 512, promotes cooperation between copyright claimants and online services to minimize online infringements. *Schenck v. Orosz,* No. 3:13–CV–0294, 2013 WL 5963557, at *8 (M.D. Tenn. Nov. 7, 2013); *Capitol Records, Inc. v. MP3tunes, LLC*, 821 F.Supp.2d 627, 636 (S.D.N.Y. 2011). It is an optional framework that precludes monetary relief and broad injunctions against online service providers who are otherwise liable for infringement and meet the optional safe harbor conditions.

*Capitol Records, Inc.*, 821 F.Supp.2d at 636. Apart from its substantive defenses to AJ's claims, SoundCloud is entitled to summary judgment on its qualification for the safe harbor.[9]

### 1. Overview of the Section 512(c) Safe Harbor by Reason of Storage of Material at the Direction of Users and Related Activities

OCILLA provides safe harbor for four different types of online activity for online service providers. 17 U.S.C. §§ 512 (a)-(d). Section 512(c) safe harbor is available for to protect against liability "by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by of for the service provider." 17 U.S.C. § 512(c)(1). *See e.g.*, *Wolk v. Kodak Imaging Network, Inc.*, 840 F.Supp.2d 724, 744 (S.D.N.Y. 2012) (chatroom provider); video hosting *UMG Recordings, Inc. v. Veoh Networks, Inc.*, 665 F.Supp.2d 1099 (C.D. Cal. 2009) (video hosting); (*CoStar v. LoopNet*, 164 F.Supp.2d 688 (D. Md. 2001) (user-created real estate listings). While section 512(c) harbor depends upon the core service of storage of material at the direction of users, it protects other actions that naturally accompany storage, including creation, streaming, and downloading of files. *See UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 718 F.3d 1006, 1016-1020 (9th Cir. 2013) (section 512(c) encompasses automatic processes undertaken to facilitate public access to user-uploaded videos, like creation of chunked and Flash files and the streaming and downloading of videos); *Viacom v. YouTube*, 676 F.3d 19, 38-40 (2nd Cir. 2012) (section 512(c) protects functions to facilitate access to user-stored material, including transcoding and performance of videos).

---

[9] While ostensibly the safe harbor provides a limitation on remedies, the fact that only a narrow injunction would remain available after summary judgment on the safe harbor, and that any injunction would merely require SoundCloud to do exactly what it already does for copyright holders, means that the case would be moot and subject to dismissal. *See Io Group, Inc., v. Veoh Networks, Inc.,* 586 F. Supp. 2d 1132, 1141, 1154-44 (N.D. Cal. 2008)(mootness); 17 U.S.C. § 512(c)(no liability for monetary relief for injunctive relief beyond that of section 512(j)); 17 U.S.C. § 512(j)(1)(A) (permissible scope of injunction).

To obtain safe harbor protection, a service provider must designate an agent to receive notifications of claimed infringement. *Id.* § 512(c)(2). It must adopt, notify subscribers and account holders of, and reasonably implement a policy that provides for the termination in appropriate circumstances of subscribers and account holders who are repeat infringers; it must also accommodate, and not interfere with, "standard technical measures." *Id.* § 512(i)(1)(A). The statute also provides that a service provider qualifies if it:

> (A)      (i) does not have actual knowledge that the material or an activity using the material on the system or network is infringing;
>
> (ii) in the absence of such actual knowledge, is not aware of facts or circumstances from which the infringing activity is apparent; or
>
> (iii) upon obtaining such knowledge or awareness, acts expeditiously to remove, or disable access, to the material;
>
> (B) does not receive a financial benefit directly attributable to the infringing activity, in a case where the service provider has the right and ability to control such activity; and
>
> (C) upon notification of claimed infringement as described in [section 512(c)(3)], responds expeditiously to remove, or disable access to, the material that is claimed to be infringing or to be the subject of infringing activity.

*Id.* § 512(c)(1).

### 2.      SoundCloud Meets the Conditions for the Section 512(c) Safe Harbor.

#### a.      SoundCloud Provides Services Under Section 512(c).

Section 512(k)(1)(B) defines a service provider "a provider of online services or network access, or the operator of facilities therefor." AJ has admitted that SoundCloud meets this definition of a service provider. *See* SOUF ¶ 10, 23.

This suit arises out of SoundCloud's activities by reason of storage of sound recordings at the direction of its users. As its terms of use state: "The platform is a hosting service. Registered users of the Platform may submit, upload and post audio . . . which will be stored by

SoundCloud at the direction of such registered users...." *See id.* ¶ 23; *see also* Exhibit 22 to the Declaration of Megan West in Support of Defendant SoundCloud Ltd.'s Motion for Summary Judgment ("West Dec."). AJ's claims of infringement all turn upon SoundCloud's activities relating to that core function and "for the purpose of facilitating access to user-stored material." Complaint ¶ 8, SOUF ¶¶ 2-12, 14-16. The making available of online streams, downloads, and offline listening provides access to user-stored material. *See id.* AJ and others store the material at their own direction. *See id.* SoundCloud did not store any material at its own direction on its service. *Id.*¶¶ 4, 15. SoundCloud therefore qualifies as a service provider engaging in activities within the scope of section 512(c).

> **b.** **SoundCloud Designated an Agent to Receive Notifications of Claimed Infringement and Expeditiously Responds to Notifications, but AJ Never Sent SoundCloud Any Notifications.**

There is no dispute that SoundCloud designated an agent to receive notifications of claimed infringement. SOUF ¶ 71. The law specifies the requirements for valid notifications of claimed infringement in section 512(c)(3). When SoundCloud receives valid notifications of claimed infringement through its webform email or otherwise through its designated agent, it expeditiously processes them. *Id.*¶ 68-81. AJ has never submitted a valid notification of claimed infringement to SoundCloud. *Id.*¶ 158. SoundCloud meets these safe harbor conditions.

> **c.** **SoundCloud Lacks Actual Knowledge of Specific Infringements of AJ's Music.**

AJ admits that it never notified SoundCloud of infringements. *See* SOUF ¶ 158. The undisputed evidence shows that SoundCloud did not otherwise obtain actual knowledge of specific infringements. As a hosting platform SoundCloud has no capacity for firsthand knowledge of infringement. *See id.*¶ 133; Hayes Dec. ¶ 10. SoundCloud can only respond to

notifications of claimed infringement and remove specific alleged infringements from its platform.

AJ has argued that its provision of reference files to SoundCloud, for fingerprinting to detect matching files and prevent their uploads to the service, provided SoundCloud with actual knowledge of infringements on its system. The argument fails here for both factual and legal reasons as it did on the contributory infringement standard.

First, SoundCloud's Content ID system automatically blocks uploads of materials to the platform when it identifies matching files unless the copyright holder has whitelisted either an uploader or file. Its job is to give strong protection against infringements by detecting matches alone, without evaluating whether the matches are actually infringing. That a reference file is in Content ID does indicate that infringements have occurred or will occur: Content ID blocks authorized users from uploading files when a rightsholder has failed to whitelist them, even though the uploads would not be infringements. Any alleged infringing uploads either predated SoundCloud's receipt of reference files, were whitelisted by AJ, or did not match the reference files. *See* SOUF ¶¶ 58, 126, 133, 140-142, 160. For these reasons, as a matter of fact, Content ID was incapable of providing SoundCloud with actual knowledge of any infringements. *See id.*

Moreover, while Content ID and reference files allow SoundCloud to prevent potential infringements, under section 512(m) of the DMCA the applicability of safe harbor protection cannot be conditioned upon SoundCloud's monitoring efforts. 17 U.S.C. § 512(m). AJ's argument flies in the face of section 512(m). SoundCloud meets this safe harbor condition.

### d. SoundCloud Has No Awareness of Red Flag Circumstances of Apparent Infringement of AJ's Works.

The evidence is undisputed that SoundCloud lacked awareness of facts or circumstances suggesting infringements, or so-called "red flags." "Red flag" awareness involves a high standard: for example, domain names such as "illegal.net" and "stolencelebritypictures.com" do *not* constitute "red flags," and the DMCA does not place on a service provider the burden of determining whether activity is actually illegal. *See Perfect 10, Inc., v. CCBill LLC,* 488 F.3d 1102, 1114 (9th Cir. 2007).

Defective notifications of claimed infringement under section 512(c)(3) do not qualify as "red flags." *Id.* (citing 17 U.S.C. § 512(c)(3)). Here, of course, AJ did not send SoundCloud *defective* notifications; it sent *no* notifications. In short, nothing raised red flags of apparent infringement of AJ's works for SoundCloud's copyright team. *See* SOUF ¶¶ 58, 126, 133, 140-142, 160. To the contrary, SoundCloud provided numerous tools to copyright holders and even to the public to report alleged infringements, and nothing gave SoundCloud any indication of infringements. *See id.* Because the record firmly establishes that SoundCloud lacked any "red flag" awareness of infringement of AJ's works, SoundCloud meets that safe harbor condition.

### e. SoundCloud Derives No Direct Financial Benefit from Infringements of AJ's Works.

SoundCloud gained no financial benefit from infringements of AJ's works. From the beginning of AJ's relationship with SoundCloud, AJ's tracks have been accessible to SoundCloud users who access the platform for free. *See* SOUF ¶¶ 2, 96-98 127. Paying subscribers have access to some premium content that is not available to users with free accounts. *Id.* ¶ 99. AJ's tracks, however, are not premium content. AJ's tracks were marked "public" and thus accessible to all users, whether those users had free service or a premium

31

subscription.  *Id.* ¶ 98, 100.  Because AJ's audio files were equally available to free and paid subscribers of SoundCloud, AJ's recordings cannot have attracted anyone to pay for subscriptions.  Nor did SoundCloud rely upon any AJ material to promote or sell its paying subscriptions or to sell advertising.  *See* SOUF ¶ 154 (citing West Dec. ¶ 17).

To the extent AJ argues that the offline listening feature deprives SoundCloud of the safe harbor because that feature is available only to paying subscribers, that also fails.  Temporary offline listening is generally available throughout the subscription service and is not specific to AJ's works.  A "direct financial benefit" is not a *general* financial benefit but one *directly* from the infringement of *a plaintiff's* works.  *See Giganews,* 847 F.3d at 673-74 (construing "direct financial benefit" in the context of a vicarious liability claim).  The undisputed evidence demonstrates that SoundCloud did not derive any income directly from infringement of AJ's works, and SoundCloud meets this safe harbor condition.

### f.  SoundCloud Lacks the Right and Ability to Control the Alleged Infringements.

Nor does SoundCloud have the "right and ability to control" infringements of AJ's works.  17 U.S.C. § 512(c)(1)(B).  The fact that SoundCloud takes steps that the safe harbor encourages, like removing material from the service upon receipt of a claim of infringement or enforcing a repeat infringer termination policy, does not mean that it has a right and ability to control the infringing activity that would deprive it of the safe harbor.  That would cause a service provider to forfeit safe harbor by qualifying for it, which would make the law internally inconsistent.  *See Io Group,* 586 F.Supp.2d at 1151.  Similarly, the right and ability to control infringing activity does not refer to SoundCloud's design and control of its platform because "the plain language of Section 512(c) indicates that the pertinent inquiry is not whether [the service

provider] has the right and ability to control its system, but rather, whether it has the right and ability to control the infringing activity." *Id.*

In this case, *AJ and not SoundCloud had the right and ability to control* the temporary offline listening of its works yet AJ chose never to alter the system default setting for offline listening of the works. SOUF ¶¶ 31-41, 147-149, 153, 155, 157-159. The SoundCloud platform does not give SoundCloud the ability to override controls that its uploaders set to deny temporary offline listening. *See id.* ¶¶ 31-41. If AJ wants to prevent temporary offline listening to AJ's sound recordings, AJ could set permissions on the files it uploaded to preclude it, change the settings on its files from "public" to "private," or remove its tracks from service. *See id.* It has the control, not SoundCloud.

### g. SoundCloud Adopted, Informs Subscribers and Account Holders of, And Reasonably Implements Its Repeat Infringer Termination Policy.

SoundCloud's repeat infringer termination policy is one of many measures to ensure that users do not upload copyrighted material without authorization. *See* Hayes Dec. Ex. 1. SoundCloud educates its users by giving them the policy in several locations: on SoundCloud's website, in its terms of use and community guidelines, and in its help center. SOUF ¶ 20, 26, 82-90; West Dec. Exs. 13, 17, 22-25. SoundCloud described its repeat infringer termination policy and practices above at page 6. SoundCloud easily meets this condition.

### h. SoundCloud Accommodates, and Does Not Interfere with, Any Statutory "Standard Technical Measures."

A condition of the safe harbor is that a service providers accommodate and not interfere with "standard technical measures." The Copyright Act defines "standard technical measures" in part as those "used by copyright owners to identify or protect copyrighted works" that have been

"developed pursuant to a broad consensus of copyright owners and service providers in an open, fair, voluntary, multi-industry standards process."  17 U.S.C. § 512(i)(2).

AJ does not use any measures that qualify under the Act as "standard technical measures."  AJ has not identified any such measures, and as a matter of law, no "standard technical measures" have ever been recognized by a court of which SoundCloud is aware, apart from a suggestion that watermarks on photographs may serve that function.

SoundCloud has shown that it meets all conditions of the safe harbor under section 512(c).  It is entitled to summary judgment in its favor on the safe harbor.

### E.    SoundCloud's Equitable Defenses Defeat AJ's Claims

#### 1.    Average Joe's Granted Licenses to SoundCloud and its Users.

A non-exclusive license to use copyrighted material is a waiver of the "right to sue the licensee for copyright infringement" and "precludes a finding of infringement."  *Murphy v. Lazarev*, 589 Fed. Appx. 757, 764-65 (6th Cir. 2014) (quoting *Johnson v Jones*, 149 F.3d 494, 500 (6th Cir. 1998)).  A copyright holder may grant a non-exclusive license in writing, orally, or through implied conduct, including the copyright owner's failure to object when the owner is aware of the allegedly infringing activity.  *Roger Miller Music, Inc. v. Sony/ATV Pub., LLC*, No. 3:04-01132, 2005 WL 5351103, at *17 (M.D. Tenn. July 11, 2005), *aff'd in part and rev'd in part on other grounds*, 477 F.3d 383 (6th Cir. 2007) (citing *Viacom Int'l, Inc. v. Fanzine Int'l, Inc.*, No. 98 CIV. 7448(KMW), 2000 WL 1854903, at *5 (S.D.N.Y. July 12, 2000).  *See also Murphy*, 589 Fed. Appx. at 766; *Effects Assocs., Inc. v. Cohen*, 908 F.2d 555, 558-59 (9th Cir. 1990); 3 Nimmer on Copyright § 10.03.

AJ granted SoundCloud an implied non-exclusive license on all of the tracks asserted in this case through its conduct.  AJ knew its songs were on SoundCloud's platform and made a

business decision not to remove them or request their removal.  SOUF ¶¶ 147-149, 153, 155, 157-159.   This implied license bars AJ's claims.

In accepting SoundCloud's Terms of Use, AJ also granted SoundCloud and its users explicit non-exclusive licenses to use its copyrighted material.  To upload material to the SoundCloud platform, a user must agree that it "grant[s] such licences to SoundCloud" to "authorise  the use, reproduction, transmission, distribution, public display, public performance, making available and other communication to the public of Your Content on the Platform and elsewhere using the [SoundCloud] services."  SOUF ¶¶ 13, 127; West Dec. Ex. 22; *see also* West Dec. Ex. 24.1.  Additionally, a user must acknowledge that SoundCloud might "introduce other services and/or features for the Platform."  *See id.*  AJ agreed to these terms before uploading the tracks it asserts in this case to SoundCloud.  *See id.*  The new terms of use on March 29, 2016, expressly included the right of users to listen to material offline, and they described in detail how Average Joe's could control permissions (which included permissions related to offline listening.  SOUF ¶ 30.  The explicit licenses in SoundCloud's terms of service thus bar all of AJ's claims.

## 2.  Average Joe's Acquiesced to the Alleged Infringements.

The defense of acquiescence requires "'a finding of conduct on the plaintiff's part that amounted to an assurance to the defendant, express or implied, that plaintiff would not assert his . . . rights against the defendant.'"  *Clever Factory, Inc. v. Kingsbridge Int'l, Inc.*, No. 3:11-1187, 2013 WL 5375258, at *5 (M.D. Tenn. Sept. 24, 2013) (quoting *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 894 (6th Cir. 1991)).  *See also District Brewing Co., Inc. v. CBC Restaurant, LLC*, No. 2:15-CV-3114, 2016 WL 1366230, at *4-5 (S.D. Ohio Apr. 6, 2016); *Johnny's Fine Foods, Inc. v. Johnny's Inc.*, 286 F.Supp.2d 876, 882-83 (M.D. Tenn. 2003).  The defense absolves SoundCloud of any liability.

35

In October 2012, AJ informed SoundCloud that it had found ███████████ ████████ on SoundCloud and wanted to see if it could ████████████████ ████████ SOUF ¶ 128. SoundCloud promptly advised AJ about two methods to report unauthorized files, and it also informed AJ that it could remove files using SoundCloud's ████ platform. *Id.* ¶ 130. AJ never provided the information SoundCloud requested in its response to Mr. Thompson's October 2012 email and did not express any desire to pursue legal action. SOUF ¶ 131-132.

Between 2013 and December 2016, when Plaintiff filed this lawsuit, AJ continued to interact with SoundCloud, upload music on its platform, and negotiate with SoundCloud. *Id.* ¶ 132. Despite this communication, AJ never indicated that it planned to take legal action, and it did not seek removal of any material. *Id.* ¶¶ 147-149, 153, 155, 157-159. That effectively authorized it. AJ's inaction was intentional, to increase the later value of a potential licensing agreement with SoundCloud. *See id.* By failing to remove tracks and by continuing its business partnership with SoundCloud, AJ acquiesced to the alleged infringing activity and implied to SoundCloud that it would not take legal action. The acquiescence bars AJ's claims.

### 3. Average Joe's Failed to Mitigate Its Alleged Damages.

"[A]n injured party has a duty to mitigate damages by exercising reasonable care and due diligence to avoid loss or to minimize damages after suffering injury." *Frank Betz Assocs., Inc. v. J.O. Clark Const., L.L.C.*, No. 3:08-cv-00159, 2010 WL 2253541, at *18 (M.D. Tenn. May 30, 2010). *See also Energy Intelligence Group, Inc. v. Kayne Anderson Capital Advisors, LP*, No. H-14-1903, 2018 WL 2048896, at *3-6 (S.D. Tex. May 2, 2018); *Malibu Media, LLC v. Guastaferro*, No. 1:14-cv-1544, 2015 WL 4603065, at *6 (E.D. Va. July 28, 2015).

SoundCloud told AJ that it would remove any unauthorized tracks if AJ reported the track on the SoundCloud platform or sent a URL for each track to copyright@soundcloud.com.

36

SOUF ¶ 130.  Additionally, AJ admitted that it had—and still has—the ability to remove

unauthorized tracks using SoundCloud's ███ platform.  *Id.* ¶¶ 31-41, 135, 147-149, 153, 155,

157-159.  AJ understood and knew it could remove tracks on its own.  *See id.*

Instead of removing the tracks AJ asserts and avoiding any alleged harm, AJ

affirmatively chose to keep the works they assert on the SoundCloud platform because it

believed this would increase its bargaining power in licensing negotiations with SoundCloud.

*See id.*  This failure to mitigate damages reduces or bars entirely AJ's claims.

### F.     The Copyright Act Strictly Limits AJ's Potential Statutory Damages.

*Even if SoundCloud were liable for infringement, which it does not concede*, any possible

statutory damages award in this case would turn not on the number of individual tracks or

musical works but on the number of albums AJ asserts, as both (a) compilations of the

underlying sound recordings and (b) derivative works based upon both the sound recordings and

their underlying musical works.  Moreover, AJ's failure to timely register works before alleged

infringement began or within three months of publication restricts its potential recovery to

statutory damages for five works, not the 100 works AJ claims.

### 1.     The Copyright Act Has Clear Rules on Statutory Damages.

The Copyright Act has explicit registration timing rules and "work" counting rules for the

calculation of statutory damages.  As for timing, to obtain statutory damages, AJ must prove that

it registered each claimed copyright either (a) before the first infringement or (b) within three

months of publication of a work.  17 U.S.C. § 412.  Where a series of alleged infringements has

occurred, the date of the first governs.  *Johnson v. Jones*, 149 F.3d 494, 506 (6th Cir. 1998); *see

Dorchen/Martin Assocs., Inc. v. Brook of Cheboygan, Inc.*, No. 11–10561, 2013 WL 140790,

at*2-4 (E.D. Mich. Jan. 11, 2013) (partial summary judgment on statutory damages because

infringements commenced before registration).

37

While the Copyright Act authorizes statutory damages on a per-work basis, it explicitly provides that, *for purposes of calculating damages*, "all the parts of a compilation or derivative work constitute one work." 17 U.S.C. § 504(c)(1). This Court has applied this provision of the Copyright Act strictly: in *King Records, Inc. v. Bennett*, the Court explained, "'all the parts of a compilation or derivative work constitute one work'" even if "'they are regarded as independent works for other purposes.'" 438 F.Supp.2d 812, 864 (M.D. Tenn. 2006) (quoting H.R.Rep. No. 94–1476, 2d Sess. at 162, *reprinted in* 1976 U.S.C.C.A.N. at 5778).

The statutory definitions of "derivative works" and "compilations" are critical. First, a "'derivative work' is a work based upon one or more preexisting works, such as a . . . *sound recording*"). 17 U.S.C. § 101(definition of "derivative work"). The Copyright Office explains that sound recordings are derivative works *of underlying musical compositions*: "A sound recording usually embodies a preexisting musical composition . . . and in that sense it is a derivative work of the underlying musical . . . work which has been performed and recorded." Compendium III of Copyright Office Practices section 803.6 ("important note"); *see also* 1 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 2.10 (2018).

Second, the Copyright Act defines the term "compilation" to "include[] collective works." 17 U.S.C. § 101. "A 'collective work' is a work . . . in which a number of contributions, constituting separate and independent works in themselves, are assembled into a collective whole." *Id*.; *see* 1 Nimmer on Copyright § 3.02 (2018).

Third, both the Copyright Act and its legislative history make clear that the special rule for calculating statutory damages coexists with other rules regarding derivative works and compilations. Thus, as the Fourth Circuit ruled in *Xoom, Inc. v. Imageline, Inc.*, 323 F.3d 279, 285 (4th Cir. 2003), registration of a collective work may authorize a suit for individual

38

component parts, but that does not mean that each component part gets a separate statutory damages award. The court relied on both the statutory language and the legislative history: "Although parts of a compilation or derivative work may be 'regarded as independent works for other purposes[,]' for purposes of statutory damages, they constitute one work. H.R.Rep. No. 94-1476, at 162 (1976)." *Xoom,* 323 F.3d at 285.

### 2. For Statutory Damages Purposes, the Relevant "Works" Here Are AJ's Albums, Which Are Compilations That Include Both Individual Sound Recordings and Their Underlying Musical Compositions.

Combining the various definitions, (1) a sound recording is a derivative work of an underlying musical composition and (2) an album is (i) both a compilation and a derivative work of the sound recordings that are parts of it and (ii) a derivative work of musical compositions underlying the sound recordings. In this case, all the sound recordings and musical compositions are parts of 16 albums. There is no dispute about that fact. AJ merely denies that the Copyright Act means what it says.[10]

In *King Records* this Court extensively analyzed how to count "works" for statutory damages purposes, ultimately ruling a plaintiff was entitled to a single statutory damages award for each registered album as a compilation of sound recordings included in it. The court cited the legislative history of the Copyright Act as supporting the clear statutory language. It also cited *UMG Recordings, Inc. v. MP3.com, Inc.*, 109 F.Supp.2d 223, 225 (S.D.N.Y. 2000), which ruled that an album containing multiple sound recordings constitutes a single work for statutory damages calculation. After *King Records,* the Second Circuit ruled specifically that albums are

---

[10] AJ apparently relies on a particular *industry* meaning of a "compilation album" as one with particular types of collections, such as a collection of holiday songs or a collection "Best hits of 2018." But the *statutory* definition is much broader than that. And it expressly includes "collective works," which AJ admits its albums to be. *See* 17 U.S.C. § 101 (definition of "compilation"); Bridges Dec. ¶ 20, Ex. 61 (AJ's Resp. to RFA No. 426-427).

compilations entitled to a single statutory damages award each.  *See Bryant v. Media Right Prod'ns, Inc.,* 603 F.3d 135, 140-41 (2d Cir. 2010).  Other decisions of this Court have followed this rule.  *See One Media IP Ltd. v. Henry Hadaway Organization*, Case No. 3:14-cv-00957, 2016 WL 3523885, at \*2 (M.D. Tenn. June 28, 2016) (awarding statutory damages for 32 works incorporating 1,466 sound recordings but later vacating judgment for lack of personal jurisdiction); *Tennessee Walking Horse Breeders & Exhibitors Ass'n v. National Walking Horse Ass'n,* 528 F.Supp.2d 772 (M.D. Tenn. 2007) (over 400,000 horse pedigrees in distinct registry certificates counted as one work because they were parts of a compilation).

Here, all the works AJ claims are parts of albums.  SOUF ¶ 109-110.  All of the individual sound recordings appear in copyright registrations for albums.  *Id.*  Each album is both a compilation of its component sound recordings and a derivative work of those sound recordings.  *See* 17 U.S.C. §§ 101, 504(c); *King*, 438 F.Supp.2d 812.  Furthermore, each album is are also a derivative work of underlying musical compositions: each of the musical compositions AJ asserts underlies a sound recording that is part of an album.  *See id.*; SOUF ¶¶ 109-110, 115.  Each album at issue is therefore one "work" for statutory damages purposes: a derivative work of the underlying sound recordings *and* the musical works that in turn underlie the sound recordings.  *See id.*; *One Media*, 2016 WL 3523885 at \*2; *UMG Recordings*, 109 F.Supp.2d at 225; *Bryant*, 603 F.3d at 140-41.

This treatment of albums as the "works" at issue for statutory damages purposes is consistent with AJ's business practices because its production, release, registrations, and recordkeeping are all on an album basis.  SOUF ¶¶ 111-114, 117-118; Bridges Dec. ¶ 20, Ex. 60 (AJ's Resps. to RFA Nos. 426-428).  To be specific: AJ prepared, issued, and registered all of the sound recordings it asserts as collective works in the form of albums; it promoted the claimed

40

works as albums; it released the claimed works as albums; and it registered the underlying musical compositions using as a publication date the date AJ released the corresponding *album*. *Id*. Even where AJ released a single from an album, it was to promote the album. *Id.*¶ 112. This is further evidence that all of the works (both sound recordings and musical compositions) AJ asserts are parts of collective works, which are compilations and derivative works in the form of albums. AJ's album-centered business model thus dovetails with the Copyright Act's treatment of its works as parts of albums for statutory damages purposes. The albums are therefore the relevant "works" for calculating any available statutory damages.

### 3. There Is No Reason to Depart from the Copyright Act's Limitation on Parts of Compilations and Derivative Works In This Case.

SoundCloud anticipates that AJ will argue that the parts of the albums it asserts should count as separate works for statutory damages purposes because those parts can carry an "independent economic value," but this position is incorrect and has no basis in the Copyright Act or the law of this Circuit. The Copyright Act is explicit and clear in its instruction on how to count works for statutory damages purposes. *See* 17 U.S.C. § 504(c)(1). The "independent economic value" test improperly departs from this framework and finds no place in the statute; it is an anomaly derived from specific facts in a Ninth Circuit case that are inapposite here. *See Columbia Pictures Television v. Krypton Broad. Of Birmingham, Inc.*, 106 F.3d 284, 295 (9th Cir.1997). Even within the Ninth Circuit, courts have declined to follow the test: in *Adobe Sys., Inc., v. Tanvir*, the Northern District of California, in examining a request for statutory damages in a default judgment, held that 19 copyrighted works constituted six works for statutory damages purposes because most of the claimed works were part of the Adobe Creative Suite, a compilation of computer programs, which together counted as only one "work" for statutory damages. Civil case no. 16-cv-6844 (CRB), slip op. at n.3 (N.D. Cal. July 13, 2017). Moreover,

this Court has previously followed the lead of the Southern District of New York, which also reflects the majority rule of the Second and Fourth Circuits. *See Bryant*, 603 F.3d at 142; *Xoom, Inc.*, 323 F.3d at 285. There is therefore no reason to depart from the rules of the Copyright Act as written in this case, which require counting of AJ's claimed works by its albums that include individual sound recordings and their underlying musical compositions.

### 4. Statutory Damages Are Available to AJ for No More Than Five Works That It Registered Within Three Months of Publication.

A plaintiff always bears the burden of proving entitlement to damages. In this context, *even assuming liability, which SoundCloud does not concede,* AJ's ability to recover any statutory damages award rests on its ability to prove it registered copyrights either within three months of publication or before alleged infringements began. *See* 17 U.S.C. § 412; *Ushodaya Enterprises, Ltd. v. V.R.S. Int'l, Inc.*, 64 F.Supp.2d 352, 353 (S.D.N.Y. 1999) (plaintiff was not entitled to statutory damages because it provided no evidence of when infringement occurred or that it occurred after the registration date), *aff'd*, 2 F. App'x 128 (2d Cir. 2001) *Data Gen. Corp. v. Grumman Sys. Support Corp.*, 825 F.Supp. 361, 364 (D. Mass. 1993), *aff'd and remanded*, 36 F.3d 1147 (1st Cir. 1994); 2 Nimmer on Copyright § 7.16 (2017); *Lickerish, Inc. v. Alpha Media Grp.*, No. CV 13-00377 DMG (SSX), 2014 WL 12589641, at *6 (C.D. Cal. Jan. 2, 2014).

AJ registered only five works within three months of publication.[11] As to the other works, AJ cannot prove it registered the works *before* infringements began for the simple reason that *it cannot prove when the alleged infringements began.*

---

[11] The five works are (1) the album "190 Proof," registration no. SR 669-572, bearing a publication date of April 3, 2012 and a registration date of April 23, 2012; (2) the album "Diesel Fuel," registration no. SR 699-540, bearing a publication date of February 2, 2012 and a registration date of April 23, 2012; (3) the album "The Grind," registration no. SR 753-210, bearing a publication date of August 26, 2014 and a registration date of October 14, 2014; (4) the album "Mud Digger Vol. 2," SR 682-888, bearing a publication date of July 19, 2011 and a registration date of August 15, 2011; and (5) the musical composition "She Likes to Ride in

AJ has played fast and loose with the date the alleged infringements began. AJ has

contended during the litigation that alleged infringement on the SoundCloud platform began on

March 29, 2016, when SoundCloud launched the paid subscription option, Bridges Dec. Ex. 62,

but an email that AJ's Mr. Thompson sent to SoundCloud on October 1, 2012, complained about

████████████████████████ already on the platform then. SOUF 128. The only evidence

suggests that any alleged infringements of AJ's works on SoundCloud began immediately upon

release of each album, including well before 2012. SOUF ¶ 126. A corporate witness for

Girlilla Marketing, AJ's contractor for social media marketing from 2008 to 2012, testified that

infringements of AJ's works occur "everyday" "on every single platform" across the Internet,

and that this was true throughout the time Girlilla worked with AJ. *Id.* If that was the case,

many of the works AJ asserts have untimely registrations and cannot have a statutory damages

award. AJ has not provided, and cannot provide, evidence to establish the commencement dates.

The fact that it may have documented later alleged infringements is irrelevant to proof of the *first*

infringement dates, which is what matters for statutory damages under the statute.

Because AJ has the burden but cannot prove it registered its works before infringements

began, and because all of its works were parts of a small number of albums, AJ can recover

statutory damages for only five works that it registered within three months of publication. 17

U.S.C. § 412; SOUF ¶ 121.[12]

---

Trucks," registration no. PA 1-744-321, bearing a publication date of May 3, 2011 and a
registration date of July 3, 2011 (AJ failed to register the album this musical composition
underlies within three months of publication). SOUF ¶ 121.

[12]Application of the timing and calculation rules for statutory damages yields these results
depending on Plaintiff's proof:

- If Plaintiff cannot prove when infringements began: only 5 "works" at issue (because
  registrations occurred within 3 months of publication). SOUF ¶ 121-123, Bridges Dec. ¶
  15, Ex. 57.

## <u>CONCLUSION</u>

For the reasons SoundCloud explained above, SoundCloud is entitled to summary judgment on AJ's claims of direct and contributory infringement. In the alternative, it is entitled to partial summary judgment on the limitation of statutory damages under 17 U.S.C. §§ 412 and 504(c)(1).

Respectfully submitted,

Dated: September 7, 2018

By: _/s/ Andrew P. Bridges_

Andrew P. Bridges (*admitted pro hac vice*)
Ciara N. Mittan (*admitted pro hac vice*)
Guinevere L. Jobson (*admitted pro hac vice*)
**FENWICK & WEST LLP**
555 California Street, 12th Floor
San Francisco, CA 94104
Telephone: (415) 875-2300
Facsimile: (415) 281-1350
abridges@fenwick.com
cmittan@fenwick.com gjobson@fenwick.com

Richard G. Sanders
(Tenn. BPR No. 23875)
**AARON & SANDERS, PLLC**
605 Berry Road, Ste. A
Nashville, TN 37204
Telephone (615) 734-0770
Facsimile (615) 250-9807
rick@aaronsanderslaw.com

*Attorneys for Defendant and Counterclaimants*
SoundCloud Ltd.

---

- If AJ can prove infringements began in 2012 (which SoundCloud does not concede): 10 "works" at issue. SOUF ¶ 124, Bridges Dec. ¶ 16, Ex. 58.

- If AJ can prove infringements began in 2016 (which SoundCloud does not concede): 16 "works" at issue. SOUF ¶ 125, Bridges Dec. ¶ 17, Ex. 59.

SoundCloud will discuss the timing issues further in reply to AJ's response to this argument.

**CERTIFICATE OF SERVICE**

I hereby certify that on September 7, a true and correct copy of the foregoing has been served via the Electronic Case Filing system of the United States District Court for the Middle District of Tennessee, which will automatically send email notification to the following counsel of record:

Stephen E. Grauberger
Joseph Rau III
**Franklin Business Law**
1224 Columbia Ave.
Franklin, TN 37064
steve@franklinbusinesslaw.com
joe@franklinbusinesslaw.com

/s/ Andrew P Bridges
Andrew P. Bridges

*Attorneys for Defendant and Counterclaimant*
SoundCloud Ltd.